CC-1997-46                                    1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| General Gases & Supplies Corp.<br>    Recurrido<br><br>       v.<br><br>Shoring & Forming Systems, Inc.<br>et als.<br>    Peticionarios | Certiorari<br><br>2001 TSPR 54 |

Número del Caso: CC-1997-46

Fecha: 18/abril/2001

Tribunal de Circuito de Apelaciones:
                              Circuito Regional I

Juez Ponente:
                              Hon. Yvonne Feliciano de Bonilla

Abogado de la Parte Peticionaria:
                              Lcdo. Fernando L. Gallardo

Abogado de la Parte Recurrida:
                              Lcdo. Julio Nigaglioni Arrache

Materia: Cobro de Dinero

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

General Gases & Supplies Corp.

     Recurrido


       v.                              CC-1997-46

Shoring & Forming Systems, Inc.
et als.

     Peticionarios

**Opinión de Tribunal emitida por la Juez Asociada señora NAVEIRA DE RODÓN**


San Juan, Puerto Rico a 18 de abril de 2001


I

En 1986 se constituyó la corporación demandada Shoring & Forming Systems, Inc. (en adelante Shoring o peticionaria) para dedicarse al alquiler de equipos utilizados en la industria de la construcción para fraguar concreto en posición horizontal (gavetas voladoras) y vertical ("strongbacks"). General Gases & Supplies Corp. (en adelante General Gases) se dedicaba al negocio de ferretería y, venta y alquiler de equipo de construcción e industrial.

El 23 de febrero de 1993, General Gases presentó una demanda en cobro de dinero contra Shoring. Shoring negó que adeudara la suma reclamada y presentó una reconvención. En ésta, la peticionaria alegó que General Gases (1) violó el contrato habido entre las partes, (2) abusó del proceso judicial maliciosamente para obtener una orden de embargo por más de lo reclamado en la demanda, (3) ocasionó la anulación de las operaciones de Shoring, (4) difamó al divulgar indiscriminadamente a otros contratistas y clientes de la peticionaria la incapacidad de Shoring en el negocio a sabiendas de la falsedad de dicha información y (5) no pagó lo adeudado por concepto de equipos y materiales alquilados. Shoring solicitó de General Gases $5,000,000 en concepto de daños y perjuicios, y $7,355.13 por deudas.

El 4 de diciembre de 1995, General Gases presentó una moción de sentencia sumaria. En ésta, General Gases aceptaba la existencia de un "entendido" de que mientras el Sr. Burgos se desempeñara como Director de la División de Andamios de General Gases y a la misma vez como consultor, accionista y miembro de la Junta de Directores de Shoring, ambas compañías no debían competir entre sí. Por el potencial conflicto de intereses que esta posición

de Burgos presentaba, decidieron no alquilar los equipos que arrendaba la otra. Alegaron, además, que nunca se pactó o discutió, qué ocurriría si el Sr. Burgos dejaba sus funciones en Shoring para irse a General Gases. Específicamente, si bajo esas circunstancias las compañías continuarían con el acuerdo antes mencionado o no. General Gases alegó que este acuerdo era contrario a la ley y al orden público, específicamente, por violar las leyes antimonopolísticas de Puerto Rico y federales al constituir un pacto de no competir.

En la oposición a la moción de sentencia sumaria, Shoring expuso que General Gases estaba impedida de levantar la defensa de ilegalidad del acuerdo pues no la presentó en la réplica a la reconvención como defensa afirmativa. Arguyó, además, que existían controversias sustanciales de hechos materiales que le impedían al tribunal dictar sentencia sumariamente. En la declaración jurada del Sr. Guillermety que acompañó a la referida oposición, se expresó que el acuerdo entre Shoring y General Gases no era como alegaba el Sr. Burgos de que éste finalizaría cuando su relación con Shoring terminara, sino que continuaría hasta que las partes, de común acuerdo, lo terminaran. Dicho acuerdo se instrumentó durante cinco años, de 1987 a 1992. En dicha declaración jurada se expuso que "es razonable concluir que ese tipo de acuerdo continuaría por treinta o cuarenta años porque General Gases es una compañía bien establecida en Puerto Rico y Shoring & Forming, aunque llevaba incorporada menos tiempo, ya había terminado de pagar sus equipos y se encontraba con un inventario de equipos que duraría no menos de ese periodo de tiempo".

Luego de celebrar una vista el 21 de diciembre de 1995, el Tribunal de Primera Instancia acogió la moción presentada por General Gases y dictó sentencia sumaria parcial desestimando la primera (violación de contrato) y tercera causa de acción (violaciones adicionales) de la reconvención de Shoring. El tribunal determinó que el acuerdo que ambas partes admitieron existía era nulo por ser contrario a la ley y orden público. Dio, además, por desistidas la segunda (abuso de proceso y de derecho) y quinta (cobro de dinero) causas de acción de la reconvención.[1]

Inconforme, Shoring acudió al Tribunal de Circuito de Apelaciones (Tribunal de Circuito) para pedir revisión. Éste confirmó la sentencia sumaria apelada. En síntesis expuso que el contrato entre Shoring y General Gases era nulo pues constituía un pacto de no competencia contrario a la legislación antimonopolística federal y local.

Shoring presentó un recurso de certiorari ante nos señalando que el Tribunal de Circuito erró:

1. Al confirmar la sentencia del Tribunal de Primera Instancia que declaró con lugar la moción de sentencia sumaria de General Gases, a pesar que éste había renunciado a la defensa de ilegalidad cuando no la incluyó en su réplica a la reconvención de Shoring. La defensa de ilegalidad es una de las que si no se levantan se renuncian.

---

[1] Las partes llegaron a un acuerdo parcial de transacción. Sólo quedaba, entonces, adjudicar la cuarta causa de acción.

2.    Al confirmar la sentencia del Tribunal de Primera Instancia que determinó que el contrato entre Shoring y General Gases infringe las leyes antimonopolísticas.

3.    Al confirmar la sentencia del Tribunal de Primera Instancia que no consideró la defensa de renuncia de General Gases a la reclamación de violación antimonopolística por la teoría de in pari delicto. [2]

II

El Art. 2 de la Ley de Monopolios y Restricción del Comercio, Ley Núm. 77 de 25 de junio de 1964, según enmendada, 10 L.P.R.A. § 258, (en adelante Art. 2 de la Ley de Monopolios) dispone que:

> Todo contrato, combinación en forma de *trust* o en otra forma, o conspiración para restringir irrazonablemente los negocios o el comercio en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales y toda persona que haga tales contratos o se comprometa en tales combinaciones o conspiraciones incurrirá en delito menos grave.

La letra de este estatuto proviene sustancialmente de la Sección 1 de la Ley Sherman, 15 U.S.C. § 1, en la jurisdicción federal.[3] La única visible diferencia entre ambos estatutos es la utilización del término *irrazonablemente* en la local. Esta diferencia en la redacción, sin embargo, se ha erradicado en la aplicación ya que la interpretación que se ha hecho por los tribunales federales de la Sección 1 de la Ley Sherman, *supra*, ha añadido *irrazonable* ("*unreasonable*") como parte de los elementos necesarios para probar la existencia de la práctica de comercio o negocio prohibida.[4]

Las doctrinas e interpretaciones que se han elaborado bajo la Ley Sherman, 15 U.S.C. § 1 *et seq.*, y la Ley Clayton, 15 U.S.C. § 12 *et seq*, nos ayudarán a determinar y establecer, al amparo de nuestra legislación, las normas locales que prohíben las prácticas monopolísticas y protegen la libre y justa competencia en los negocios y en el comercio. Hay que tener presente que la aplicación de estos estatutos federales no constituye campo ocupado.[5] Cuando lo que se está aplicando es la ley local, los tribunales de Puerto Rico

---

[2]    Debido al resultado a que hoy llegamos en el caso de autos, resulta innecesario discutir los señalamientos de error (1) y (3).

[3]    Ésta reza: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." La sección de la Ley de Sherman, *supra*, que aplica a Puerto Rico es la Sec. 3. Esta sección tiene una redacción similar a la Sec. 1 antes citada.

[4]    Véase, National Society of Professional Engineers v. U.S., 435 U.S. 679, 198 S. Ct. 1355 (1978); Standard Oil, Co. v. United States, 221 U.S. 1, 31 S.Ct. 502 (1911).

[5]    People of Puerto Rico v. Shell Oil, Co., 302 U.S. 253, 58 S.Ct. 167 (1937).

pueden interpretarla de una manera distinta que atienda efectivamente nuestra realidad y particularidad económica.[6]

Debido a nuestro tamaño territorial, relación política y vivencias sociales, nuestra situación económica se ha caracterizado por ser una relativamente reglamentada y dirigida por el gobierno.[7] Este tipo de economía hace aún más necesario que los tribunales diluciden de forma flexible los conflictos que surjan a los cuales les sean aplicables las disposiciones de la Ley de Monopolios, a base del criterio de razonabilidad y no como instrumento mecánico que refleje más bien una aplicación formalista del derecho.[8]

La exposición de motivos de la Ley de Monopolios es cónsona con lo antes expresado. En la misma se expresó que la medida se creó para asegurarle al Pueblo en general, y a los pequeños comerciantes en particular, los beneficios de la libre competencia. Su objetivo final era proscribir los males que atentan contra la economía general de la Isla, **"sin que se intente desalentar el progreso económico ni el fomento de éste por agencias de Gobierno, ni menoscabar la reglamentación económica que proveen otras leyes"**. Vemos pues que lo que aparenta ser un dilema, una contradicción, la coexistencia del libre comercio y la regulación del mismo por el gobierno, es en realidad una necesidad que requiere armonizarse y atemperarse a nuestras particularidades económicas. En otras palabras, en Puerto Rico alentar el progreso económico, puede en ciertas circunstancias requerir atemperar el rigor de la libre competencia. Puede implicar, en ocasiones, la intervención activa del gobierno en el comercio.

---

[6] Véase, P.R. Fuels, Inc. v. Empire Gas Co., res. 2 de noviembre de 1999, 99 J.T.S. 171, pág. 362; y Pressure Vessel v. Empire Gas, 137 D.P.R. 497 (1994). Allí expresamos que "queda abierta la **función creadora** en la aplicación de la ley, tanto en la rama ejecutiva como en la judicial **en sentido favorable a nuestro desarrollo económico, aún** [sic] **en el caso de disposiciones con precedentes en la legislación federal"**. (Énfasis suplido.) Informe Conjunto de la Comisiones de lo Jurídico, de Hacienda y de Comercio e Industria, Diario de Sesiones, Asamblea Legislativa (Cámara), 11 de mayo de 1964, págs. 1425-26.

[7] Como ejemplos de esta función interventora del Estado sobre la economía, están: (1) la ley que regula las operaciones de establecimientos comerciales (la ley de cierre actual), Ley Núm. 1 de 1 de diciembre de 1989, según enmendada, 29 L.P.R.A. § 301 et seq; (2) la Ley que regula los contratos de distribución, Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. § 278 et seq. Para la interpretación jurisprudencial de la Ley 75, supra, véase Roberco, Inc. y Colón v. Oxford Inds., Inc., 122 D.P.R. 115 (1988); (3) la autoridad que se le ha concedido a D.A.Co. para fijar precios, Ley Núm. 5 de 23 de abril de 1973, 3 L.P.R.A. § 341 et seq.

[8] En P.R. Fuels, Inc. v. Empire Gas Co., Inc., supra, pág. 362, citando a Pressure Vessels v. Empire Gas, supra, expresamos que uno de los objetivos fundamentales de la Ley de Monopolios es: "Proveer una **base flexible** para la propia ejecución de la ley, basada en una **norma de razonabilidad** que permita a nuestros tribunales tomar en cuenta las características propias y las necesidades de nuestra economía, así como los planes gubernamentales y la acción privada para fomentarla." (Énfasis suplido) Informe conjunto de las Comisiones de los Jurídico, de Hacienda y de Comercio e Industria, supra, págs. 1425-26.

En <u>Pressure Vessels P.R.</u> v. <u>Empire Gas P.R.</u>, *supra*, pág. 509, citando a *ABA Antitrust Section*, *Antitrust Law Developments*, Cap. I, pág. 3 (2da ed. 1984), expresamos que el texto del Art. 2 de la Ley de Monopolios dispone tres requisitos "que se tienen que establecer para demostrar una infracción a esta disposición: (1) deberá existir algún contrato, combinación o conspiración entre dos o más entidades separadas (2) el cual restringe irrazonablemente los negocios o el comercio (3) en Puerto Rico o en cualquier sector de éste".

En el caso de autos, Shoring y General Gases admitieron la existencia de un acuerdo, aunque de los documentos surge que sus términos específicos están en controversia. Los efectos de dicho acuerdo necesariamente se van a sentir en Puerto Rico, sobre esto no hay controversia alguna. Vemos pues que dos de los tres requisitos previamente citados están presente en el caso de marras.

III

Ahora bien, para estudiar la aplicación del tercer requisito, la restricción irrazonable, los tribunales en los Estados Unidos han desarrollado principalmente dos métodos de análisis: (1) el análisis de irrazonabilidad per se ("the per se rule") (en adelante la regla *per se*) o (2) la regla de la razonabilidad ("the rule of reason") (en adelante la regla de razonabilidad).

La regla *per se* condena la restricción comercial impugnada sin examinar su propósito o hacer un extenso análisis de su efecto en el mercado y el daño a la competencia. Como regla general, las cortes han aplicado la regla *per se* a restricciones que resulten en: (a) fijación de precios[9] horizontal y vertical, excepto la fijación máxima de precio la cual se examina bajo la regla de razonabilidad,[10] y (b) división horizontal del mercado (con algunas excepciones que se mencionarán a continuación).[11] Para efectos procesales de la regla *per se*, la parte que alegadamente violó la ley antimonopolística debe derrotar la presunción de irrazonabilidad e ilegalidad.

De otra parte, la regla de razonabilidad ("rule of reason") requiere un análisis extenso y ponderado de todas las circunstancias del caso específico. Algunos elementos a considerar cuando se utiliza este método de análisis son, entre otros: (a) estudiar los hechos particulares del negocio al que se le está aplicando la restricción, incluyendo una definición de los productos que compiten actualmente o podrían competir en el futuro; (b)

---

[9]    En Puerto Rico, al ser una economía altamente dirigida, la fijación de precios por parte del gobierno no nos es extraña, y a veces resulta indispensable para mantener el equilibrio en áreas más débiles de nuestra economía. Véase Ley de D.A.Co., *supra* (nota de calce núm. 7).
[10]    Véase, <u>State Oil Co.</u> v. <u>Khan</u>, 522 U.S. 3, 118 S.Ct. 275 (1997).
[11]    En los casos donde exista un (a) un acuerdo para atar un producto con otro ("t*ying arrangement*"), (b) un acuerdo de reciprocidad, o (c) un boicot de grupo, se necesita la existencia de elementos adicionales, como la coerción o fijarse si uno de los negocios es sustancialmente más poderoso

la composición y comportamiento del mercado; (c) la condición del negocio o mercado antes y después de la restricción; (d) la naturaleza de la restricción; (e) el efecto real o probable de la restricción; Chicago Board of Trade v. United States, 246 U.S. 231, 244, 38 S.Ct. 242 (1918).

Ahora bien, el impacto en la competencia, bajo la regla de razonabilidad, no se debe confundir con el impacto que una restricción pueda tener sobre **un competidor**, ya que la Ley Sherman se creó para proteger la **competencia** y no a los **competidores**. Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224, 113 S.Ct. 2578. Por ende, la determinación de una violación del Art. 1 de la Ley Sherman no puede fundamentarse en el impacto que la restricción tuviese en un solo competidor o negocio sin que exista otra prueba de un efecto **a la competencia en general en un mercado particular**. Cargill, Inc. v. Montfort of Colo., Inc., 479 U.S. 104, 107 S.Ct. 484 (1986), en Von Kalinowski, *supra*, pág. 12-12.

En Puerto Rico, al igual que en algunas jurisdicciones federales, uno de los elementos más importantes en el análisis bajo la regla de razonabilidad es el estudio del mercado particular que alegadamente se está afectando por la restricción. Esto requiere, entre otras cosas, que el tribunal determine el tipo de mercado de que se trata, si es uno altamente concentrado o de múltiples firmas de negocios, ninguna de las cuales tiene mucho poder dentro de ese mercado particular; si es un mercado de fácil entrada donde la competencia potencial es un factor importante que hay que tomar en consideración. La idea detrás de esta determinación inicial parte de la premisa que las restricciones impuestas por firmas de negocio que no tienen poder en el mercado no pueden, como regla general, afectar sustancialmente la competencia y, por ende, ser irrazonables. Véase, Von Kalinowski, *supra*, pág. 12-13. Este análisis del poder en el mercado requiere una definición y estudio del mercado en particular o de los varios submercados que puedan quedar afectados. Esto se hará a través de estudios empíricos y económicos del producto y, el área geográfica donde se sienta la competencia. *Id*. pág. 12-14.[12]

---

económicamente, para que las cortes apliquen la regla *per se*. Von Kalinowski, *supra*, pág. 12-3.

[12] Cabe señalar que en el ámbito federal se ha desarrollado una tercera metodología híbrida para determinar irrazonabilidad, donde no es indispensable traer prueba sobre poder en el mercado. FTC v. Indiana Federation of Dentists, 476 U.S. 447, 106 S.Ct. 2009 (1986). *Id.* pág. 12-15. En NCAA v. Board of Regents of the University of Oklahoma, 468 U.S. 85, 104 S.Ct. 2948 (1984), el Tribunal Supremo Federal expresó que cuando existe una clara restricción en precio, no es esencial traer prueba sobre el poder que tienen en el mercado los negocios involucrados. En otras palabras, la posible violación a la ley antimonopolística era tan patente que, sin tener que utilizar la regla *per se* o el extenso y ponderado estudio de la regla de razonabilidad, se podía adjudicar la controversia utilizando la regla de razonabilidad sumariamente; **se podía detectar y balancear sumariamente los efectos beneficiosos, nocivos o alternos de la restricción en la competencia.** Phillip E. Areeda, *Antitrust Law: an analysis of antitrust principles and their application*, Vol. VII, 1986, pág. 403. A esta doctrina

Debido a la incertidumbre que reflejan la decisiones del Tribunal Supremo Federal en cuanto a la aplicación de las normas antes señaladas,[13] resulta imperativo que al insuflar vida a nuestra normativa antimonopolística utilicemos nuestra creatividad interpretativa para darle una aplicación que vaya a la par con nuestras realidades económicas. Esto implica que, al beneficiarnos de la experiencia de Estados Unidos, lo hagamos caso a caso, amoldando la aplicación de los principios antes discutidos a una economía muy distinta.

IV

En aras de lo antes mencionado, cuando un juzgador se enfrente a un caso como éste, donde se cuestione la razonabilidad de una restricción, debe ser sumamente cauteloso antes de concluir que debe utilizar el método de la regla *per se* para adjudicar la controversia. Como regla general, en Puerto Rico no se debe resolver un caso bajo el Art. 2 de la Ley de Monopolio bajo el procedimiento de la regla *per se*. Tampoco, como regla general, este tipo de caso se dilucidará mediante el mecanismo procesal de la sentencia sumaria, Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III R 36. Esto es así ya que el juzgador, antes de elegir por cuál doctrina se inclinará su análisis del caso, si la regla *per se* o la regla de razonabilidad, deberá tener ante sí todos los elementos necesarios que le permitan tomar una decisión acertada.

En el caso de autos, los términos del acuerdo, incontrovertidos por las partes y aceptados como tales por el Tribunal de Primera Instancia y el Tribunal de Circuito, exponían que: (1) General Gases y Shoring habrían de complementarse entre sí en el alquiler de los productos que no formaban parte del respectivo negocio de cada uno; (2) por el equipo que alquilara Shoring de General Gases en el área de andamios, Shoring recibiría de General Gases una comisión; (3) por el equipo que General Gases alquilara de Shoring en gavetas

---

se le conoce como la regla de razonabilidad sumaria o "the truncated rule of reason".

En el caso de autos no se puede utilizar este método de análisis ya que de las alegaciones y los documentos que las acompañan no se puede hacer el respectivo balance para analizar la restricción.

[13] Para la visión tradicional de 1940, la cual condenaba, como regla general, cualquier restricción, véase, U.S. v. Socony-Vacuum Oil, Co., 310 U.S. 658, 60 S. Ct. 1091 (1940). Esta visión comenzó a cambiar en la década de 1970 con Broadcast Music, Inc. v. C.B.S., Inc., 441 U.S. 1, 99 S.Ct. 1551 (1979) y en la de 1980 con N.C.A.A. v. Board of Regents of Univ. Of Okla., 468 U.S. 85, 104 S.Ct. 2948 (1984). En la década de 1990, sin embargo, la tendencia para aplicar las doctrinas se mostraba un tanto incierta con casos en que la corte utilizaba la visión tradicional como F.T.C. v. Superior Court Trial Lawyers Ass'n., 493 U.S. 411, 110 S.Ct. 768 (1990) y de más flexibilidad como State Oil, Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275 (1997).

voladoras y *strongbacks*, General Gases recibiría una comisión; (4) General Gases referiría clientes que necesitaran gavetas voladoras y *strongbacks* a Shoring; (5) Shoring, a su vez, referiría clientes que necesitaran andamios a General Gases; (6) el Sr. Burgos trabajaría como director de la división de andamios de General Gases sin desvincularse de sus labores como consultor y accionista de Shoring.

De los datos anteriormente expuestos, los cuales surgen con meridiana claridad del expediente, podemos concluir que el acuerdo entre General Gases y Shoring era uno de no competencia cuyo efecto era complementar sus respectivos negocios en el área de "gavetas voladoras" y "strongbacks". Ahora bien, debe tenerse presente que no todo acuerdo de no competencia que complementa un negocio o un acuerdo entre competidores potenciales es de por sí y, sin más, ilegal y detrimental a la competencia.[14] De hecho, en este caso en particular existen circunstancias que reflejan la necesidad de que se realice un análisis al amparo de la regla de razonabilidad.

En primer lugar, los términos del acuerdo distan de estar claros, específicamente en cuanto a la duración del mismo.[15] La falta de claridad en los términos del acuerdo hace difícil definir en términos precisos en qué constituye la restricción, y mucho menos auscultar sus efectos. En segundo lugar, en el expediente se hace referencia varias veces sobre la alta competencia en esa "área del mercado" sin que se haya hecho el más mínimo esfuerzo de definir el mercado de que se trata.[16] Si es muy competitiva esta "área del mercado", el efecto de la restricción podría ser *de minimus* y hacer totalmente inaplicable la legislación antimonopolística y, por ende, innecesario el análisis de razonabilidad. En tercer lugar, bajo la regla de razonabilidad tradicional no se pueden estudiar los efectos de una restricción en la competencia sin tener claro de qué mercado estamos hablando.

---

[14]   El Tribunal Supremo Federal, desde finales del siglo XIX ha sostenido que un pacto de no competencia por motivo de la venta de uno de los negocios en el acuerdo no debe ser juzgado bajo la regla *per se*. Addyston Pipe & Steel Co. v. U.S., 175 U.S. 211, 20 S.Ct. 96 (1899). A mediados del siglo XX, el Tribunal Supremo Federal extendió la aplicación de lo antes expresado para los acuerdos de no competencia cuando hay envueltos contratos de empleo. Schine Chain Theatres, Inc. v. U.S. 334 U.S. 110, 68 S.Ct. 947(1948), overruled on other grounds, 467 U.S. 752 (1984). En cuanto a nuestra jurisdicción sobre cláusulas de no competencia en contratos de empleo, véase Arthur Young & Co. v. Vega III, 136 D.P.R. 157 (1994).

[15]   Cuando los efectos de un acuerdo en particular no están claros, el tribunal debe cohibirse de utilizar la regla *per se*, especialmente cuando no pueden estudiar el efecto de la restricción impugnada. Véase, Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 294-98, 105 S. Ct. 26134 (1985). Von Kalinowski, supra, pág. 14-10.

[16]   De hecho, existen varias referencias en el expediente sobre la gran competencia que existe en "ese mercado". Una es en la carta de General Gases al Sr. Guillermety, supra, de 21 de septiembre de 1990: "Entendemos y reconocemos sus costos así como la competencia desmedida que existe en este campo...". En la Moción de Sentencia Sumaria, General Gases expresó, en la pág. 8, que "desde entonces, General Gases ha sido competidor activo en este mercado junto a otras compañías que se dedican al mismo giro". Shoring,

Resulta totalmente inaceptable pretender establecer el fundamental elemento del mercado afectado utilizando la frase "el mercado de la construcción" sin más detalles.  Resulta obvio que no estamos ante una restricción que afecte al "mercado de la construcción" en general.

Finalmente, recordemos lo que mencionamos al principio del acápite IV de que no toda restricción impugnada bajo el Art. 2 la Ley de Monopolio debe ser juzgada bajo la regla *per se*.  La mera aseveración de que la restricción afecta el comercio no la cualifica *ipso facto* como irrazonable *per se*, y, por ende, ilegal.  La decisión inicial del juzgador sobre el escrutinio que utilizará para analizar la irrazonabilidad de una restricción no debe tomarse a la ligera.  Las decisiones al respecto desarrollarán la tendencia anti-formalista en cuanto a la aplicación de nuestra Ley de Monopolios.  Tendencia que debe atender las necesidades de nuestra delicada economía, donde cualquier decisión, por pequeño que parezca su efecto, puede tener grandes repercusiones en la economía.  No se puede comparar con Estados Unidos donde, con probable certeza, la misma decisión no tenga semejante efecto.  Aplicar ligeramente la regla *per se* en Puerto Rico, podría afectar adversamente la economía.  Por consiguiente, erraron los tribunales de instancia y de Circuito al juzgar *ipso facto*, mediante el mecanismo procesal de la sentencia sumaria, la irrazonabilidad de la restricción bajo la regla *per se*.

Hay que tener presente que al analizar el caso de autos, bajo el escrutinio de la regla de razonabilidad, el hecho que la restricción afecte directamente a un comerciante o competidor no es la vara adecuada para medir el efecto, si alguno, que tuvo en la competencia general la restricción impugnada.  El expediente del caso no nos presenta un cuadro fáctico adecuado para adjudicar la violación, si alguna, del Art. 2 de la Ley de Monopolios.

Por lo antes expuesto, procede revocar la sentencia del Tribunal de Circuito emitida el 2 de diciembre de 1996, y devolver el caso para que continúen los procedimientos de forma consistente con lo aquí resuelto.  En primer lugar, una vez el tribunal de instancia tenga ante sí todos los detalles fácticos que puedan delinear la existencia de alguna restricción, puede determinar si se debe aplicar o no la Ley de Monopolios.  De determinar que no es una restricción *de minimus*, debe entonces adentrarse en la aplicación de la Ley de Monopolios según discutida previamente.

Se dictará la correspondiente sentencia.


                              Miriam Naveira de Rodón
                                  Juez Asociada

---

en el Informe de la Conferencia con Antelación al Juicio, pág. 7, se refiere a la industria como una "de las más competidas en Puerto Rico".

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


General Gases & Supplies Corp.

        Recurrido


            v.                          CC-1997-46


Shoring & Forming Systems, Inc.
et als.

        Peticionarios



SENTENCIA



San Juan, Puerto Rico a 18 de abril de 2001



        Por los fundamentos expuestos en la anterior Opinión, se dicta sentencia revocando la emitida por el Tribunal de Circuito el 2 de diciembre de 1996, y se devuelve el caso para que continúen los procedimientos de forma consistente con lo aquí resuelto.  En primer lugar, una vez el tribunal de instancia tenga ante sí todos los detalles fácticos que puedan delinear la existencia de alguna restricción, puede determinar si se debe aplicar o no la Ley de Monopolios.  De determinar que no es una restricción *de minimus*, debe entonces adentrarse en la aplicación de la Ley de Monopolios según discutida previamente.

        Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.



                            Isabel Llompart Zeno
                        Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

General Gases & Supplies
Corp.

    Recurrido

        vs.                              CC-1997-46 Certiorari

Shoring & Forming Systems,
Inc. et als.

Opinión de Conformidad emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 18 de abril de 2001.

Estamos fundamentalmente de acuerdo con la Opinión del Tribunal. No obstante, subscribimos esta opinión separada para emitir algunos pronunciamientos adicionales que estimamos podrían ser de beneficio al Tribunal de Primera Instancia al adjudicar la controversia de autos una vez el caso le sea devuelto.

En primer lugar, coincidimos con la mayoría en cuanto a la particularidad de la economía y la política pública puertorriqueña.

Esto hace necesario que nuestra jurisprudencia interpretativa de la Ley de Monopolios no se rija estrictamente por las interpretaciones que                                              hacen

los   tribunales de las correspondientes leyes federales. Por tanto, no tenemos ninguna objeción con limitar la aplicación de la regla *per se* y utilizar con más frecuencia la regla de razonabilidad, para que de tal forma se haga un análisis más detenido de los hechos particulares de cada caso.

También concurrimos con la determinación de devolver el caso al foro de instancia por entender que los hechos que obran en el expediente no son suficientemente específicos. No está claro en dicho expediente ni cuál es la restricción impuesta por el acuerdo entre las partes, ni cuál es el mercado pertinente. Estas son determinaciones de crucial importancia al dilucidar las controversias presentes en este caso.

Sabido es que en muchas ocasiones el análisis de un caso bajo la Ley de Monopolios comienza con la importante caracterización de la restricción al comercio impuesta por el acuerdo entre las partes, y la definición del mercado que se ve afectado por ésta. Véase, e.g., State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984). Una vez se determina qué tipo de restricción está presente, y a qué mercado afecta, entonces se puede decidir cuál es la metodología correcta a utilizarse al evaluar el acuerdo, sea la regla *per se* o la regla de razonabilidad, entre otras. Id. Así pues, al saber si la restricción es una fijación de precios horizontal, o un "tying arrangement", o un "concerted refusal to deal", por ejemplo, podemos decidir que metodología utilizar al continuar el análisis.

En este caso, nos parece que puede haber diferentes tipos de restricciones impuestas por el acuerdo. Por un lado, nos podemos estar enfrentando a un acuerdo de transacción exclusiva ("exclusive dealing arrangement") bilateral en el cual cada compañía se está comprometiendo a arrendar andamios o gavetas voladoras, respectivamente, de la otra de manera exclusiva. Este tipo de restricción vertical está específicamente prohibida por el Art. 6 de la Ley de Monopolios, Ley Núm. 77 de 25 de junio de 1964, 10 L.P.R.A. sec. 262, que provee que será ilegal el que cualquier persona arriende con la condición de que el arrendatario no pueda usar o negociar en bienes de un competidor del arrendador cuando en cualquier línea de comercio el efecto de tal arrendamiento pueda ser el de reducir sustancialmente la competencia o tender a crear un monopolio.

Tradicionalmente, estas transacciones exclusivas se analizan bajo la regla de razonabilidad. Pressure Vessels of Puerto Rico v. Empire Gas de Puerto Rico, 137 D.P.R. 497, 521 (1994).

Por otro lado, si las partes acordaron no invadir el negocio de arrendamiento de la otra, en espíritu de mutua cooperación, y/o se determinara que no son mercados distintos (el de las gavetas voladoras y el de los andamios) sino que el mercado pertinente es uno más amplio, de maquinaria de construcción, la restricción podría considerarse una división horizontal del mercado. A este tipo de restricción sí le aplica en muchos casos (bajo la

jurisprudencia federal) la regla *per se*. <u>United States v. Topco Associates, Inc.</u>, 405 U.S. 596 (1972).

En resumen, estamos de acuerdo con la mayoría en que la solución correcta a este problema es devolver el caso a instancia para que dicho foro dilucide cuál es la restricción impuesta por el acuerdo para que entonces se decida qué metodología utilizar al evaluarla. Entendemos, además, que una vez se determine qué tipo de restricción es la que se estableció mediante el acuerdo, el foro de instancia debe tomar en consideración la discusión que se incluye en la Opinión del Tribunal sobre la regla *per se vis-a-vis* la regla de razonabilidad en el contexto puertorriqueño para que ésta le sirva de guía al analizar el caso de autos.


Federico Hernández Denton
Juez Asociado