ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| CEMEX DE PUERTO RICO, INC.; CEMEX CONCRETOS, INC. Apelado<br><br>v.<br><br>TERRASSA CONCRETE INDUSTRIES, INC. Apelante | KLAN202300968 | Recurso de *Apelación* procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Caso Núm. D CD2010-2285<br><br>Sobre: Cobro de dinero |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Rivera Marchand y el Juez Salgado Schwarz.

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de abril de 2024.

Comparece ante nos Terrassa Concrete Industries, Inc. (Terrassa o apelante) y solicita que revoquemos la *Sentencia* que el Tribunal de Primera Instancia, Sala de Bayamón (TPI o foro primario) notificó el 4 de agosto de 2023. En esta, el TPI declaró ha lugar la demanda sobre incumplimiento de contrato y cobro de dinero que instaron Cemex de Puerto Rico, Inc. y Cemex Concretos Inc. (Cemex) en contra de Terrassa y desestimó la reconvención, según presentada.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado. Adelantamos que, para una mejor comprensión del recurso ante nuestra consideración y en atención a los nueve señalamientos de error, resaltaremos algunos hechos procesales que corresponden al extenso litigio en este caso. Veamos.

**I.**

Cemex es una corporación dedicada a la producción, distribución y venta de cemento. Ante la falta de cumplimiento de

pago de Terrassa por materiales suplidos, Cemex incoó la demanda de epígrafe el 2 de julio de 2010.[1] En esta adujo que, a pesar de los requerimientos de pago, Terrassa se negó a satisfacer la deuda líquida y exigible, por lo que solicitó al TPI declarar ha lugar la demanda y ordenar a Terrassa satisfacer el pago de $462,000.00 más intereses, costas, gastos y honorarios de abogado.

En reacción, Terrassa negó las alegaciones e interpuso una reconvención.[2] En ella expuso que, la alegada obligación de pago estaba sujeta a una condición suspensiva. Lo antes, a los efectos de que, Cemex cesara de aumentar el precio del cemento sin previo aviso y que se abstuviera de vender el hormigón a su subsidiaria, Cemex Concretos, a precios muy por debajo del mercado, en detrimento de los intereses de Terrassa.

Terrassa indicó además que, "luego de varios meses sin comprarles y pagarles,"[3] el Presidente de Cemex de Puerto Rico, Inc., Sr. Leopoldo Navarro, citó una reunión con el Sr. Luis Enrique Terrassa Muñiz y el Sr. Eduardo A. Carbonell (Presidente y Gerente General de Terrassa, respectivamente). Explicaron que, lo antes respondía a una situación en el mercado con otra empresa conocida como Master Concrete. Según las alegaciones de Terrassa, durante esa reunión, Cemex se comprometió a suspender las prácticas antes descritas, para que Terrassa reanudara las compras de cemento. Subsiguientemente, Terrassa volvió a comprar cemento a Cemex, pero, al determinar que, presuntamente esta última continuó la práctica de venta de hormigón, a precio muy por debajo del mercado, cesó de comprar cemento adicional a Cemex. A pesar de que las partes se reunieron en otras ocasiones para dialogar sobre el particular, Terrassa reiteró su postura. Expuso en sus alegaciones que, ante la postura de Cemex, "de aumentarle el precio del

---

[1] Apéndice, págs. 1-2.
[2] Apéndice, págs. 7-16.
[3] Apéndice pág. 10, alegación 14.

cemento, pero, por otro lado, Cemex Concretos Inc. reducir su precio de ventas del hormigón, decide suspenderle las compras de cemento y de pagarle [...]."[4]

En la reconvención Terrassa también alegó que, entre febrero y marzo del año 2010, se subastaron de 10 a 15 proyectos de mayor volumen y que en todos Cemex cotizó precios muy por debajo de los precios del mercado y garantizó los referidos precios para la duración del proyecto cotizado. Terrassa adujo que, lo antes lo puso en desventaja, por lo que, Cemex fue favorecido por los contratistas.[5] Sobre tales bases, Terrassa imputó a Cemex haber incurrido en prácticas comerciales para restringir el comercio, lo cual atenta en contra de la justa y libre competencia de los negocios dedicados a la venta de hormigón y el comercio, siendo así una monopolización ilegal. Lo antes, al amparo de la Ley Núm. 77 de 25 de junio de 1964, según enmendada, Ley Antimonopolística de Puerto Rico (Ley Antimonopolística), 10 LPRA secs. 257 *et seq.*

Previo a acreditar su alegación responsiva a la reconvención, Cemex instó una primera solicitud de desestimación,[6] la cual el TPI denegó mediante una *Resolución*[7] notificada en autos el 23 de diciembre de 2010. Con posterioridad, Cemex contestó la reconvención y negó las alegaciones de Terrassa. Destacó que, Cemex PR y Cemex Concretos son una sola entidad a los fines del requerimiento de combinación que dispone el artículo 1 de la Ley Sherman (Sherman Anti-Trust Act 15 USCS sec. 1011 *et seq.*) y la legislación antimonopolística aplicable. Sostuvo que, no puede conspirar consigo misma y reiteró que, conduce sus negocios conforme a ley. A su entender, las gestiones de Terrassa dirigidas a que, Cemex aumentara el precio de venta de su hormigón, fueron

---

[4] Apéndice, pág. 12, alegación 23.
[5] Apéndice, pág. 13.
[6] Apéndice, págs. 17-28.
[7] Apéndice, págs. 49-50.

realizadas bajo amenaza. Adujo que, si Cemex no actuara conforme lo indicado, Terrassa no pagaría el cemento que le adeuda. Arguyó que, lo antes resulta ser un mecanismo de presión para que Cemex entre en acuerdos ilegales de fijación de precios para la venta de hormigón con Terrassa y Cemex se ha negado así hacerlo. Por tal razón, sostuvo que, Terrassa se ha negado a pagarle, pretendiendo quedarse con el cemento que compró y con el dinero que recibió, por la venta del cemento que vendió convertido en hormigón. Suplicó al foro primario que declarara no ha lugar la reconvención y que ordenara el pago de costas, gastos y honorarios de abogado.[8]

Ulteriormente, Cemex presentó un segundo petitorio de desestimación. En esta ocasión, el TPI declaró Ha Lugar la solicitud y mediante una *Sentencia Parcial*,[9] notificada el 23 de abril de 2012, ordenó la desestimación de la reconvención por falta de jurisdicción sobre la materia. Terrassa acudió ante esta Curia y solicitó la revocación de la referida *Sentencia Parcial*.[10] Un panel hermano (Recurso Núm. KLAN201300318) revocó el dictamen desestimatorio emitido por el foro primario y en su consecuencia, permitió la reconvención por entender que, el TPI tiene jurisdicción para atender los señalamientos sobre monopolización y actos para restringir el comercio. Específicamente, autorizó la presentación de prueba pertinente a las Secciones 258 (actos para restringir el comercio) y 263 (discrimen en precios) de la Ley Antimonopolística.[11] En consecuencia, se ordenó la continuación de los procesos.[12]

Ahora bien, es preciso señalar que, a lo largo de más de trece años de litigio, el TPI entretuvo múltiples incidencias procesales atinentes al descubrimiento de prueba y otros asuntos. En su

---

[8] Apéndice, págs. 122-133.
[9] Apéndice, págs. 226-236.
[10] Apéndice, págs. 226-237.
[11] Artículos 2 y 7 de la Ley Antimonopolística, 10 LPRA secs. 258 y 263, respectivamente.
[12] Al acudir en revisión ante el Tribunal Supremo (Recurso Núm. CC-2013-0543) nuestro más Alto Foro denegó la expedición del auto. Apéndice, pág. 377.

consecuencia, se instaron ante esta Curia, catorce recursos de naturaleza interlocutoria.[13] Destacaremos algunos de los recursos que guardan mayor relación con los errores que hoy nos corresponde atender.

En primer lugar, Cemex solicitó al foro primario que adjudicara la demanda en cobro de dinero por la vía sumaria. Ante la denegatoria del referido petitorio (por existir controversias en cuanto al vínculo entre las partes y si la obligación de pago estaba supeditada a una condición suspensiva, así como, sobre la alegada competencia desleal), Cemex acudió ante esta Curia en búsqueda de revisión judicial. Un panel hermano (Recurso Núm. KLCE201501664) denegó la expedición del auto de *certiorari*.[14] Cabe señalar que, en la referida resolución, el TPI consignó 5 hechos incontrovertidos de los cuales destacamos los siguientes: 4. Terrassa Concrete adquirió cemento de Cemex Puerto Rico, Inc. para la producción de hormigón para la reventa, entre el 2 de diciembre de 2009 y el 4 de marzo de 2010. 5. Terrassa Concrete tiene un balance de $410, 551.62, pendiente de pago a favor de Cemex Puerto Rico, Inc. por material de cemento entregado y no pagado.[15]

De igual manera, Terrassa procuró la revisión de un dictamen interlocutorio, mediante el cual, el TPI denegó su petición de descubrir cierta prueba y su solicitud de un término adicional para presentar un informe pericial. Evaluado lo anterior, denegamos la expedición del auto de *certiorari* (Recurso Núm. KLCE202200638).[16]

---

[13] Véase KLCE201100394; KLAN201201221; KLCE201201238; KLCE201201337 consolidado con KLCE201201338; KLAN201300318; KLCE201300403; KLCE201300955; KLCE201301309; KLCE201400633; KLCE201501664; KLCE202200638; KLCE202300042 consolidado con KLCE202300118.

[14] Surge de los autos originales del caso de epígrafe que, luego de esta Curia denegar el petitorio de reconsideración, tras este asunto ser objeto de una paralización bajo la Ley de Quiebras y luego de Cemex acudir en revisión judicial ante el Tribunal Supremo, el asunto fue devuelto por el máximo foro ante esta Curia (CC-2017-0891), con el efecto de que la solicitud de reconsideración de Cemex fue evaluada y denegada.

[15] Veáse autos originales Tomo 9.

[16] Luego de solicitar revisión ante el Tribunal Supremo (Recurso Núm. CC-2022-0606), dicho foro denegó la expedición del auto de *certiorari*.

Por último, Terrassa instó dos recursos adicionales. El primero, dirigido a dejar sin efecto la *Resolución*[17] en la cual el TPI excluyó el testigo pericial y ocho (8) testigos adicionales. El foro primario excluyó el testigo pericial, el Lic. Reynaldo Quiñones, debido a que, previamente dispuso no conceder otra extensión de tiempo para producir el informe pericial, luego de permitir prórrogas. Excluyó a los ocho (8) testigos de Terrassa, por estos no haber sido anunciados en el Informe sobre Conferencia con Antelación al Juicio de 2013, ni durante el descubrimiento de prueba. Al cabo de tres meses, Terrassa instó otro recurso, en el cual cuestionó la denegatoria del foro primario a transferir la fecha del juicio en su fondo.[18] Evaluado lo anterior, un panel hermano de esta Curia (Recursos Núm. KLCE202300042 y KLCE202300118) consolidó ambos recursos y denegó la expedición de los autos de *certiorari*.[19]

Superado lo anterior, el TPI celebró el juicio en su fondo en el cual autorizó el desfile de prueba testifical y documental.[20] Aquilatada la misma, el foro primario emitió la *Sentencia* apelada mediante la cual declaró ha lugar la demanda de Cemex y desestimó la reconvención que instó Terrassa. De conformidad, condenó a Terrassa al pago de $410,561.65 a favor de Cemex, más intereses

---

[17] Apéndice, págs. 990-991.

[18] Apéndice, pág. 1117.

[19] No conteste, Terrassa solicitó revisión judicial ante el Tribunal Supremo (CC-2023-0095), y nuestro más Alto Foro denegó la expedición del auto.

[20] <u>Prueba Estipulada</u>: Exhibit 1: Voluntary Petition for Non-Individuals; Exhibit 2: Corporate Resolution del 14 de enero de 2016; Exhibit 3: Numbered listing of creditors; Exhibit 4: Schedule A/B doc #42; Exhibit 5: Stipulation Regarding Voluntary Dismissal with Bar to Refile; Exhibit 6: Order Approving Settlement/Stipulation; Exhibit 7: Order Doc 128; y Exhibit 8: Estados de cuenta por pagar de Terrassa. <u>Prueba Documental admitida de la parte demandante</u>: Exhibit 1: Estados de cuenta, facturas y conduces. <u>Prueba Documental admitida de la parte demandada</u>: Exhibit 1: Declaración jurada de Marlyn Díaz; Exhibit 2: Carta dirigida a Lic. Carmen Rocafort; Exhibit 3: Carta vía facsímile dirigida al Ing. Calderón; Exhibit 4: Carta a Todos Nuestros Clientes; Exhibit 5 Carta dirigida a Sr. Leopoldo Navarro, fechada 3/8/2010; Exhibit 6: Cotizaciones del 2008 al 2011; Exhibit 7A hasta 7Q: Cotizaciones; Exhibit 8: Cotización Terrassa; y Exhibit 9: Cotización Aireko Construction; Exhibit 10: Cotización F & R Construction Group. <u>Los testigos</u> presentados por la parte demandante: Sr. Guillermo García, Sr. José García y el Sr. Juan Francisco Navarro. Por la parte demandada: Sr. Luis Terrassa Muñiz y la Sra. Marlyn Díaz Feliciano.

legales y $1,000.00 en honorarios por temeridad. En su dictamen, el TPI consignó los siguientes hechos:

**Hechos estipulados por las partes:**

1. Cemex es una corporación debidamente organizada, bajo las leyes del Estado Libre Asociado de Puerto Rico, dedicada a la producción, venta y distribución de cemento, en Puerto Rico.
2. Terrassa es una corporación debidamente organizada, bajos (sic) las leyes el Estado Libre Asociado de Puerto Rico, dedicada a la producción y venta de hormigón.
3. Entre el 2 de diciembre de 2009 y el 4 de marzo de 2010, Terrassa adquirió cemento de Cemex, el cual utilizó para la producción de hormigón.
4. Los libros de contabilidad de Terrassa reflejan el costo del cemento adquirido a Cemex.
5. El subsidiario de cuentas por pagar de Terrassa incluye el desglose y el balance de todas las facturas por cemento adquirido por Terrassa, ajustado al precio de $5.80, por saco de cemento entregado o $5.55, por saco de cemento recogido, según aplica a cada factura.
6. El balance total de las facturas por el cemento que adquirió Terrassa, según el subsidiario de cuentas a pagar de Terrassa, asciende a $410,551.65.
7. El 15 de enero de 2016, Terrassa presentó una petición de quiebra voluntaria, bajo el Capítulo 11 de la Ley de Quiebras Federal, caso *Terrassa Concrete, Inc.*, Case No. 16-bk-182.
8. El 23 de mayo de 2017, Terrassa voluntariamente solicitó la desestimación del caso de quiebras y la misma se acogió a la solicitud el 22 de junio de 2017.

**Hechos probados en vista**

1. Cemex le vendió a Terrassa cemento por un total de $410,551.65.
2. Terrassa reconoció en un procedimiento de quiebras que le adeudaba a Cemex la suma antes señalada.
3. Terrassa le adeuda a Cemex $410,551.65, por compra de cemento.[21]

Esencialmente, el foro primario concluyó que, Terrassa admitió la deuda objeto de esta demanda y no probó la condición suspensiva. Resolvió que, carece de jurisdicción para atender las alegaciones sobre prácticas monopolísticas, o en la alternativa, que ante la insuficiencia de la prueba, Terrassa no logró establecer que Cemex incurriera en prácticas ilegales. En particular, expuso:

> [...]
> En cuanto a la controversia relacionada a la acción de cobro en el presente caso surge de la propia admisión de Terrassa, en un procedimiento de quiebras y por estipulación de ambas partes que esta demandada le adeuda a Cemex la cantidad de $410,551.65, que es la misma cantidad reclamada en la presente demanda.
> [...]
> Dado lo anterior, Terrassa le adeuda a Cemex la cantidad de $410,551.65.

---

[21] Apéndice, págs. 1120-1121.

[…]

…[Q]ueda claro que este tribunal no tiene jurisdicción para atender alegaciones de prácticas ilegales. Esto queda claro de los (sic) resuelto por el Tribunal Supremo, en el caso *Aguadilla Paint Center v. Esso*, 183 DPR 901 (2011). En dicho caso, el Alto Foro resolvió que ninguna acción que surja del Art. 3 de la Ley de Monopolios es justiciable en el Tribunal de Primera Instancia, hasta tanto el Departamento de Asuntos del Consumidor (DACo) o la Oficina de Asuntos Monopolísticos del Departamento de Justicia (OAM), según sea el caso, haya resuelto si, en efecto, se utilizaron "métodos injustos de competencia, así como las prácticas o actos injustos o engañosos en los negocios o el comercio." O sea, cualquier alegación sobre prácticas monopolísticas ilegales, primero debe ser investigada por OAM, resuelta por DACO y entonces revisada por el Tribunal de Primera Instancia, no se puede adjudicar directamente una controversia de este tipo directamente en el Tribunal de Primera Instancia como solicita la parte demandada. Por lo tanto, nada tenemos que resolver sobre prácticas monopolísticas. En la alternativa, de tener jurisdicción sobre el asunto, lo cierto es que, en el juicio en su fondo, la parte demandada no presentó suficiente evidencia para creer que Cemex incurre en prácticas indebidas. Aunque, esta parte en sala alegó que este Tribunal no le permitió presentar a su testigo principal, el Sr. Eduardo Carbonell, quien testificaría sobre la condición suspensiva del contrato y las prácticas monopolísticas, no menos cierto es que a dicha parte se le ofrecieron todas las oportunidades para presentar a su testigo. Del expediente y las vistas claramente surge que esta parte conocía cuándo sería el juicio, también que el pleito ya llevaba 13 años sin adjudicarse y aun así el día de la vista no tenía disponible este testigo. Más aún, la parte demandada tampoco solicitó que su testigo compareciera mediante videoconferencia. Igualmente, esta parte no probó que el testigo no estuviera disponible, realmente. Además, Terrassa no presentó prueba alguna de que Cemex incurriera en prácticas ilegales. Es necesario señalar que ninguno de los testigos presentados por Terrassa logró probar que Cemex incurriera en prácticas monopolísticas, no tanto por su falta de credibilidad, sino por la incapacidad de probar hechos que realmente demuestren estas prácticas, pues sus testimonios levantaron pocos hechos que demostrasen estas alegaciones. En esencia, lo único que los testigos de Terrassa lograron demostrar es que Terrassa compite con Cemex y que Cemex tiene una ventaja, porque puede vender cemento a un precio más bajo que Terrassa, no que Cemex incurra en alguna práctica indebida, aunque ciertamente domina el mercado de cemento en Puerto Rico. (Énfasis nuestro.)

[…]

En consecuencia, se condena a Terrassa Concrete Industries, Inc. al pago de $410,561.65, más intereses legales y $1,000.00 en temeridad. Además,

desestimamos la reconvención presentada por Terrassa y damos por terminado el pleito en su totalidad.[22]

Oportunamente, Terrassa solicitó reconsideración y la celebración de un nuevo juicio[23] al amparo de la Regla 48 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 48. Entre sus fundamentos, planteó que, el TPI presuntamente no le permitió presentar al Sr. Carbonell como testigo en el juicio, lo cual tuvo el efecto de no poder autenticar la mayoría de la prueba documental. Evaluado lo anterior, mediante *Resolución,*[24] notificada en autos el 28 de septiembre de 2023, el TPI denegó las súplicas de la aquí apelante. Insatisfecha, Terrassa acude ante nos y le imputa al TPI la comisión de los siguientes nueve errores:

> Erró y actuó el foro de instancia con pasión, capricho, perjuicio y parcialidad en un claro error manifiesto al desestimar la reconvención radicada por Terrassa, por entender que no tenía jurisdicción para atender la misma.
>
> Erró el foro de instancia en un claro error en derecho que denota arbitrariedad, capricho y parcialidad al resolver "en la alternativa", que en el juicio en su fondo Terrassa no presentó suficiente evidencia para creer que Cemex incurre en prácticas indebidas.
>
> Erró el foro de instancia al desestimar "en la alternativa" la reconvención por insuficiencia de la prueba.
>
> Erró el foro de instancia al dictar Sentencia declarando con lugar la demanda de Cemex.
>
> Erró el foro de instancia al declarar no ha lugar la solicitud de nuevo juicio.
>
> Erró y actuó el foro de instancia con pasión, capricho, perjuicio y parcialidad en un claro error manifiesto y abuso de discreción al determinar que Terrassa no pudo demostrar que el testigo esencial Eduardo A. Carbonell García era un testigo no disponible.
>
> Erró y actuó el foro de instancia con pasión, capricho, perjuicios y parcialidad en un claro error manifiesto y abuso de discreción al denegar una moción de transferencia de vista a pesar de existir justa causa.
>
> Erró el foro de instancia, al privarle a Terrassa de un debido proceso de ley, al no permitirle descubrir prueba, con relación a las defensas afirmativas y a la reconvención. Ni tampoco permitirle a Terrassa presentar el informe pericial en violación a las garantías de un debido proceso de ley.
>
> Erró el foro de instancia al resolver que Cemex no está obligado a producir la documentación (cotizaciones)

---

[22] Apéndice, págs. 1127-1129.
[23] Apéndice, págs. 1131-1145.
[24] Apéndice, pág. 1180.

solicitadas por Terrassa el 12 de enero de 2012, que claramente expolió en violación a las garantías de un debido proceso de ley.

En cumplimiento con nuestra *Resolución,* Cemex compareció y se opuso al recurso de epígrafe, por lo que, con el beneficio de las posturas de ambas partes, la transcripción de la prueba oral y los autos originales, procedemos a resolver.

## II.

### A. Los contratos y las obligaciones suspensivas y condicionadas

En nuestra jurisdicción rige el principio de la autonomía contractual y *pacta sunt servanda.* Las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, la moral y el orden público. Art. 1210 del Código Civil de Puerto Rico de 1930,[25] 31 LPRA sec. 3375; *Betancourt González v. Pastrana Santiago*, 200 DPR 169, 182 (2018). Los contratos tienen fuerza de ley entre las partes contrayentes, quienes vienen obligadas a observar sus términos. Art. 1044 del Código Civil, *supra*, sec. 2994.

Los contratos en Puerto Rico se perfeccionan por el mero consentimiento, y desde ese momento, las partes se obligan al cumplimiento de lo expresamente pactado y a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, *supra*. Véase, además, *Betancourt González v. Pastrana Santiago*, supra. Un contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o a prestar algún servicio. Art. 1206 del Código Civil de Puerto Rico, *supra*, sec. 3371; *Demeter Int'l v. Srio. Hacienda,* 199 DPR 706, 726-727 (2018). Además, el Art. 1028 del Código Civil de Puerto Rico, *supra*, sec. 3373, establece que "la validez y el cumplimiento de los contratos

---

[25] Hacemos referencia al Código Civil de Puerto Rico de 1930, hoy derogado, pues los hechos del caso ante nuestra consideración ocurrieron con anterioridad a la vigencia del Código Civil de Puerto Rico de 2020.

no pueden dejarse al arbitrio de uno de los contratantes". El Tribunal Supremo de Puerto Rico ha expresado que en las obligaciones contractuales la ley primaria es la voluntad de las partes y los tribunales no pueden relevar a una parte de cumplir con lo pactado cuando es legítimo y no contiene vicio alguno. *De Jesús González v. A.C.,* 148 DPR 255, 271 (1999).

De otra parte, las obligaciones condicionales, según las define el Artículo 1067 del entonces vigente Código Civil de 1930, 31 LPRA sec. 3042, son aquellas donde la "adquisición de los derechos, así como la resolución o pérdida de los ya adquiridos, dependerá del acontecimiento que constituya la condición." Para que las obligaciones condicionales sean exigibles, es necesario que se cumpla un hecho futuro e incierto. *López v. González,* 163 DPR 275 (2004).

Cabe señalar que, existen dos tipos de obligaciones condicionales: las suspensivas y las resolutorias. El elemento característico de las obligaciones suspensivas es la incertidumbre en términos de si el vínculo jurídico adquirirá eficacia o la perderá por haberse cumplido el hecho futuro e incierto. La condición suspensiva cobra eficacia si se cumple esa condición; si no se cumple, las partes quedan liberadas de la misma. *Jarra Corp. v. Axxis Corp.,* 155 DPR 764, 772-774 (2001). Así las cosas, el Artículo 1070 del hoy derogado Código Civil de 1930, 31 LPRA sec. 3045, dispone que "la condición de que ocurra algún suceso en un tiempo determinado extinguirá la obligación desde que pasare el tiempo, o fuere ya indudable que el acontecimiento no tendrá lugar". En síntesis, se extingue y desaparece el vínculo entre las partes si no se cumple dicha condición, y no se pueden exigir las prestaciones hasta tanto se haya cumplido la misma. *Jarra Corp. v. Axxis Corp.,* supra.

Las partes sujetas a una obligación suspensiva tienen que realizar esfuerzos de buena fe suficientes para cumplir sus prestaciones. De no hacerlo, éstos no pueden invocar la falta de ocurrencia de la condición como defensa para desligarse de su obligación. *Jarra Corp. v. Axxis Corp.,* supra, pág. 777. Sin embargo, la obligación condicional será nula si el cumplimiento de la condición depende de la exclusiva voluntad del deudor. Art. 1068 del Código Civil, 31 LPRA sec. 3043. Sobre este particular, el Tribunal Supremo, citando a Puig Brutau, señaló en *Jarra Corp. v. Axxis Corp., supra,* pág. 775, que:

> Es natural que el hecho incierto del que depende la eficacia de la obligación tenga que producirse con independencia de la voluntad de las partes. Si sólo dependiera de la voluntad de una de ellas, la incertidumbre recaería sobre la decisión de esta parte. En consecuencia, si se tratara del deudor, éste en realidad no estaría obligado, pues no cabe afirmar que lo esté una persona cuya obligación depende de que efectivamente manifieste querer estar obligada. J. Puig Brutau, *Fundamentos de Derecho Civil,* 3ra ed. rev., Barcelona, Ed. Bosch, 1985, T. I, Vol. II, pág. 95.

Sin embargo, aunque las condiciones potestativas están vedadas por el Art. 1068 del Código Civil, *supra,* en casos en que el cumplimiento de la condición potestativa no dependa del puro arbitrio de una de las partes, esa condición no anula la obligación. *Jarra Corp. v. Axxis Corp., supra,* pág. 777. A esos efectos, señala Puig Brutau lo siguiente:

> Pero otra cosa sin duda ha de suceder cuando la obligación depende de que el obligado adopte una decisión que suponga cierto esfuerzo o sacrificio para el mismo. Aunque la condición dependa del deudor, si no es puramente potestativa, sino que depende de que su conducta se sujete a un curso determinado, la condición no ha de producir el mismo efecto de anular la obligación que de ella dependa. No existirá obligación cuando una persona se limite a decir a otra que le venderá su casa si se decide hacerlo, pero otra cosa sucederá si lo que la primera dice a la segunda es que le venderá su casa si le trasladan de residencia. En este caso, como dice CASTÁN, la condición potestativa se aproxima a la llamada condición mixta. Ya no se trata de algo que dependa del puro arbitrio del obligado, sino de un acto cuya realización limita la libertad jurídica de quien entonces ha de considerarse verdaderamente

obligado. (Escolio omitido.) *Íd.*, citando a Puig Brutau, *op. cit.*, pág. 97.

**B. La acción de cobro de dinero**

En una acción de cobro de dinero, le corresponde al demandante probar ser el acreedor de una deuda vencida, líquida y exigible. *RMCA v. Mayol Bianchi*, 208 DPR 100 (2021). Sobre el particular, nuestro Tribunal Supremo expresó:

> La deuda es líquida por ser cierta y determinada y es exigible porque puede demandarse su cumplimiento. Así que, "al alegarse que la cuenta es 'líquida y exigible' se están exponiendo hechos, a saber: que el residuo de la cuantía **ha sido aceptado como correcto por el deudor y que está vencido.** (Citas omitidas.) (Énfasis en el original.)[26]

**C. Ley Antimonopolística de Puerto Rico**

Surge de su Exposición de Motivos que la Ley Antimonopolística, *supra*, se aprobó con el fin de impedir que ciertos grupos logren manipular y, a su vez, dominar el sector económico del país. *Depto. Justicia et al. v. Jiménez et al.,*199 DPR 293, 307 (2017). Lo antes, en la medida en que, la justa y libre competencia es inherente a nuestro sistema democrático de gobierno y promueve la actividad mercantil. *Aguadilla Paint Center v. Esso,* 183 DPR 901, 923 (2011).

A esos efectos, el Artículo 2 de la Ley Antimonopolística, 10 LPRA sec. 258,[27] condena las prácticas anticompetitivas que atentan en contra de los beneficios de la libre competencia y declara ilegal todo acuerdo o conspiración que restrinja irrazonablemente los negocios o el comercio en Puerto Rico. *Depto. Justicia et al. v. Jiménez et al.,* supra; *Aguadilla Paint Center v. Esso,* supra, a la pág. 924. Para demostrar infracción a esta sección deberá existir algún

---

[26] *Río Mar Community Association, Inc. v. Jaime Mayol Bianchi*, supra, a la página 8 de la versión digital.

[27] En particular, el referido artículo establece: "[t]odo contrato, combinación en forma de *trust* o en otra forma, o conspiración para restringir irrazonablemente los negocios o el comercio en el Estado Libre Asociado de Puerto Rico o en cualquier sector de éste, por la presente se declaran ilegales y toda persona que haga tales contratos o se comprometa en tales combinaciones o conspiraciones incurrirá en delito menos grave."

contrato, combinación o conspiración entre dos o más entidades separadas que restringe los negocios o el comercio en Puerto Rico oen cualquier sector de éste. *Gen. Gases & Supplies Corp. v. Shoring & Forming Sys.* 153 DPR 861 (2001). Análogamente, el Artículo 7 de la citada ley (10 LPRA sec. 263) prohíbe la discriminación en los precios cuyo efecto reduzca sustancialmente la competencia. En lo pertinente dispone:

> (a) Será ilegal el que cualquiera persona, directa o indirectamente, discrimine en precio entre distintos compradores de cosas objeto de comercio del mismo grado y calidad, cuando dichas cosas sean vendidas para uso, consumo o reventa en Puerto Rico, y cuando el efecto de tal discrimen pueda ser el de reducir sustancialmente la competencia o tender a crear un monopolio en cualquier línea de comercio en Puerto Rico o afectar, destruir o evitar la competencia con cualquier persona que hubiese concedido o a sabiendas hubiese recibido el beneficio de tal discriminación, o con cualquier cliente de uno de éstos.
>
> (b) [...][28]

### D. Apreciación de la prueba

El Tribunal Supremo de Puerto Rico estableció que "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778-779 (2022), citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013).

Como regla general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los foros inferiores, sin intervenir con la apreciación y la adjudicación de credibilidad que realiza el juzgador de los hechos en relación con la prueba testifical. *Pueblo v. Hernández Doble,* 210 DPR 850, 864-865 (2022); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). Sin embargo,

---

[28] 10 LPRA sec. 263.

esta regla cede si se demuestra que, el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto. *Ortiz Ortiz v. Medtronic,* supra.

Como se sabe, es doctrina reiterada por el Tribunal Supremo de Puerto Rico que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesto; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Arlequín Vélez,* 204 DPR 117, 147 (2020). A esos efectos, la parte que impugne la apreciación de la prueba es la parte encargada de señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres,* 117 DPR 645 (1986).

Por otro lado, la Regla 110 (a) de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110(a), dispone que "el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes". A su vez, en los casos civiles, la Regla 110(f) de las Reglas de Evidencia, 32 LPRA Ap. VI, R.110(f), establece que "la decisión de la juzgadora o del juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad, a menos que exista disposición al contrario".

**E. Testigo no disponible y oferta de prueba**

Como regla general, son inadmisibles por constituir prueba de referencia, las declaraciones anteriores de las personas que no están sujetas a ser contrainterrogadas durante un juicio o vista. Regla 802 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 802. Sin embargo, el inciso (b)(1) de la Regla 806, 32 LPRA Ap. VI, R. 806, permite -a modo de excepción- la admisibilidad del testimonio anterior de un testigo no disponible, si la parte contra la cual se ofrece la declaración anterior tuvo la oportunidad de confrontarlo durante la misma. Conforme establece la Regla 806 (a)(4) de las Reglas de

Evidencia, *supra,* un testigo no disponible es, entre otros, aquella persona que -a la fecha del juicio o vista- está imposibilitada de comparecer a testificar debido a una enfermedad, impedimento mental o físico. Además, cuando se establece por el foro judicial que la persona declarante no está disponible como testigo, es admisible como excepción a la regla general de exclusión de prueba de referencia el testimonio anterior en otra vista o deposición tomada conforme a derecho.  A esos efectos, le corresponde a la parte ofrecer y lograr la admisión de dicha prueba correspondiente al testimonio anterior en una vista o una deposición.

Como corolario a lo anterior, es preciso mencionar que, a través del procedimiento que establece la Regla 104(B) de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 104(B), se puede hacer un ofrecimiento de prueba, en cuyo caso se "deberá invocar el fundamento específico para la admisibilidad de la evidencia ofrecida y hacer una oferta de prueba de forma que surja claramente cuál es la evidencia que ha sido excluida y la naturaleza, propósito y pertinencia para la cual se ofrece. No será necesario invocar tal fundamento específico ni hacer la oferta de prueba cuando resultan evidentes del contexto del ofrecimiento. [...]"

Sobre los factores a considerar previo a dejar sin efecto una determinación de  admisión o exclusión de evidencia, el inciso (a) de la Regla 105 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 105 (a), establece: (1) no se dejará sin efecto un dictamen sobre admisión o exclusión de evidencia sin antes la parte perjudicada haber satisfecho los requisitos de objeción, fundamento u oferta de prueba dispuestos en la regla anterior; (2) el tribunal ha de entender que la evidencia admitida o excluida constituyó un factor decisivo al emitir la determinación cuya revocación se solicita.

Sobre este tema, el Tribunal Supremo reconoció que, el referido análisis envuelve un cálculo un tanto especulativo,

producto del cual se requiere ponderar cuál es la probabilidad de que el resultado hubiese sido distinto de haber admitido o excluido la prueba. *Izagas Santos v. Family Drug Center,* 182 DPR 463, 483 (2011). De no cumplirse lo anterior, no procede la revocación del dictamen. *Íd.*

### F. Manejo del caso ante el Tribunal de Primera Instancia

El funcionamiento efectivo de nuestro sistema judicial y la pronta disposición de los asuntos litigiosos hacen necesario que los jueces de instancia ostenten gran flexibilidad y discreción para lidiar diariamente con el manejo y la tramitación de los asuntos judiciales. *Banco Popular de Puerto Rico v. Gómez Alayón y otros,* 2023 TSPR 145, resuelto el 19 de diciembre de 2023. Es por ello que, a éstos se les ha reconocido poder y autoridad suficiente para conducir los asuntos litigiosos ante su consideración y para aplicar correctivos apropiados en la forma y manera que su buen juicio les indique. *Inre Collazo I,* 159 DPR 141, 150 (2003). El Tribunal de Primera Instancia tiene el deber ineludible de garantizar que los procedimientos se ventilen sin demora, con miras a que se logre una justicia rápida y eficiente. *In re Pagani Padró,* 181 DPR 517, 529 (2011).

Como regla general, los foros revisores no intervendrán con el manejo del caso ante la consideración del TPI. *Citibank et al. v. ACBI et al.,* 200 DPR 724, 736 (2018). Siendo así, el Tribunal Supremo ha manifestado que los tribunales apelativos no deben intervenir con determinaciones emitidas por el foro primario y sustituir el criterio utilizado por dicho foro en el ejercicio de su discreción, salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso de discreción, o que incurrió en error manifiesto. *Íd.* El ejercicio adecuado de la discreción se relaciona de manera estrecha con el concepto de razonabilidad. *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).

### G. Ley del caso

Como se sabe, el mandato es una figura enmarcada dentro de los procesos apelativos judiciales. Constituye el medio que posee un tribunal, en alzada, para informarle a un tribunal inferior qué determinación tomó sobre la sentencia objeto de revisión y para ordenarle actuar de conformidad. *Pueblo v. Rosario Paredes*, 209 DPR 155 (2022). Su principal objetivo es lograr que el foro inferior actúe de forma consistente con el dictamen del foro revisor. *Íd.*

Recibido el mandato, lo resuelto por el tribunal revisor constituye ley del caso. *Rosso Descartes v. BGF,* 187 DPR 184, 192-193 (2012). Entiéndase que, los derechos y las obligaciones previamente adjudicadas mediante un dictamen judicial final y firme constituyen la ley del caso. *Mitsubishi Motor Sales of Caribbean, Inc. v. Lunor, Inc. y otros,* 2023 TSPR 110, resuelto el 12 de septiembre de 2023. De manera que, una decisión judicial adquiere el carácter de ley del caso al constituir un dictamen final sobre los méritos del asunto considerado y decidido. *Berkan et al. v. Mead Johnson Nutrition,* 204 DPR 183, 200 (2020).

En ese sentido, tales determinaciones obligan, tanto al foro de instancia, como al foro que las dictó, en la eventualidad de que el asunto regrese ante sí. *Íd.* Como resultado, el tribunal inferior o el organismo que dictó la determinación impugnada deberá limitarse a cumplir con lo ordenado por el foro revisor. *Rosso Descartes v. BGF,* supra. A modo de excepción, sólo cuando se atenta en contra de los principios básicos de justicia es que los tribunales pueden abstenerse de aplicar la doctrina de la ley del caso. *Berkan et al. v. Mead Johnson Nutrition,* supra.

### III.

En su recurso, la apelante cuestiona en el primer señalamiento de error, la determinación del foro primario de desestimar la reconvención, por falta de jurisdicción, o en la

alternativa, por insuficiencia de la prueba. Puntualizamos que, limitaremos nuestro análisis sobre el señalamiento por insuficiencia de la prueba, así como sobre los asuntos relacionados y discutidos en los demás errores, debido a que, como cuestión de derecho, la controversia sobre falta de jurisdicción fue atendida por un panel hermano en el Recurso Núm. KLAN201300318. En el referido dictamen se estableció que, el foro primario goza de jurisdicción sobre las alegaciones de la reconvención, y en su consecuencia autorizó la presentación de prueba sobre las causas atinentes a las presuntas prácticas monopolísticas. Conforme a la normativa antes expuesta, dicho dictamen constituye la ley del caso.

Superado lo anterior, procedemos a atender conjuntamente los señalamientos de error 2, 3, 5 al 9 por su estrecha relación entre sí.

Nos corresponde, en primer lugar, examinar si la obligación de pago en controversia estaba sujeta a una condición suspensiva. En particular, la apelante sostiene que, mientras Cemex no cesara de vender a su subsidiaria, Cemex Concretos, el cemento a precios más bajos que a Terrassa, (lo que caracterizó como prácticas en contravención a las leyes antimonopolísticas), Terrassa no pagaría la mercancía entregada a ellos por Cemex.

De nuestra evaluación del recurso colegimos que, la apelante no demostró que se haya concretizado entre las partes una condición suspensiva que lo eximiera del pago de la cuantía reclamada. La apelante no presentó prueba que sustente tal condición suspensiva, ni la aceptación tácita por parte de Cemex. Surge del testimonio del Sr. Terrassa que, él junto al Sr. Carbonell, redactaron una carta (Exhibit 5 de la parte demandada) bajo la firma de este último, en donde expresaron su descontento en cuanto al aumento significativo de precio por saco de cemento, con efecto casi inmediato y a que, presuntamente Cemex garantiza precios mucho

más baratos a otros clientes, durante el término que se extienda un proyecto.[29] El Sr. Terrassa declaró que, con posterioridad al envío de dicha carta, se reunió junto al Sr. Carbonell con Leopoldo Navarro y Vladimir Tovar de Cemex, para informarles que, por las razones expuestas en su misiva, estaban "aguantando las compras de cemento y los pagos".[30] Lo antes, hasta tanto Cemex les aclare qué está ocurriendo con el alza en los precios del cemento.[31] A preguntas sobre qué ocurrió luego de dicha reunión, el Sr. Terrassa ripostó "nada".[32] Y aclaró que, durante la reunión, los representantes de Cemex se comprometieron a ofrecerles una respuesta en los próximos dos días.[33] Además es de notar que, lo antes ocurrió con posterioridad a que Cemex entregara a Terrassa el cemento objeto de este pleito. Tampoco la apelante demostró que Cemex hubiese avalado tal condición, elemento esencial según la jurisprudencia aplicable. Tal cual resolvió el Tribunal Supremo en *Jarra Corp. v. Axxis Corp,* supra, si una condición suspensiva no se concretiza, la obligación no entra en vigor, con el efecto de que las partes quedan liberadas.

De otra parte, en cumplimiento con la ley del caso, el foro primario autorizó la presentación de prueba atinente a las alegaciones de la *Reconvención* en las que Terrassa imputó a Cemex haber infringido la Ley Antimonopolística, *supra,* al presuntamente restringir irrazonablemente el comercio mediante la imposición de precios predatorios. Según antes resumido, el foro primario concluyó que Terrassa no logró el *quantum* de prueba necesario para probar sus alegaciones.

La apelante puntualiza, en la discusión de la mayoría de sus señalamientos de error, que el foro primario incidió al denegar la

---

[29] TPO 16 de febrero de 2023, págs. 139-146.
[30] TPO 16 de febrero de 2023, pág. 155.
[31] *Íd.*
[32] TPO 16 de febrero de 2023, pág. 168.
[33] *Íd.*

celebración de un nuevo juicio, al negarse a posponer el juicio en su fondo, al disponer del asunto atinente al Sr. Carbonell como testigo no disponible y al no permitir el descubrimiento de cierta prueba.

Comenzamos por exponer que, la solicitud de nuevo juicio está reglamentada por la Regla 48 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 48. En lo atinente a los fundamentos que pueden justificar la celebración de un nuevo juicio, la Regla 48.1 de Procedimiento Civil, dispone:

> (a) Cuando se descubra evidencia esencial la cual, a pesar de una diligencia razonable, no pudo descubrirse ni presentarse en el juicio.
> (b) Cuando no sea posible preparar una exposición en forma narrativa de la evidencia u obtener una transcripción de los procedimientos.
> (c) Cuando la justicia sustancial lo requiere. El tribunal podrá conceder un nuevo juicio a todas o cualesquiera de las partes y sobre todas o parte de las cuestiones litigiosas. 32 LPRA Ap. V, R. 48.1.

Sobre este tema, el Tribunal Supremo ha resuelto que, quien solicita un nuevo juicio deberá establecer: (1) que descubrió prueba nueva, luego de concluido el juicio; (2) que no es acumulativa o repetitiva; (3) que es esencial para la resolución del pleito; y (4) que de esta ser admitida cambiaría el resultado del litigio. *First Bank of P.R. v. Inmob. Nac., Inc.*, 144 DPR 901, 911 (1998), citando a *Riley v. Rodríguez de Pacheco,* 119 DPR 762, 807-808 (1987).

Con ello en mente, nos corresponde en primer lugar, examinar la solicitud de transferencia de vista. En esta Terrassa indicó que, la esposa del Sr. Carbonell –a quien Terrassa consideraba testigo principal– necesitaba de la atención personal y cuidado del Sr. Carbonell, a raíz de las fracturas sufridas en los dos antebrazos.[34] Surge del expediente que, el Sr. Carbonell y su esposa se encontraban fuera de Puerto Rico a la fecha del accidente y que el médico que la atendió producto de la emergencia no la autorizó a viajar de regreso a la Isla antes de la fecha pautada para el juicio.

---

[34] Apéndice, págs. 1107-1109.

Cabe reiterar que, el TPI denegó la solicitud de transferencia del juicio, luego de auscultar la posibilidad de que se prestara el testimonio del Sr. Carbonell por métodos alternos, como por ejemplo videoconferencia. Según discutimos en el tracto procesal, este asunto fue objeto de revisión judicial ante esta Curia y un panel hermano sostuvo dicha determinación (Recursos consolidados Núm. KLCE202300042; KLCE202300118), y el Tribunal Supremo (Recurso Núm. CC-2023-0095) no expidió el auto de *certiorari* instado respecto a ello.

En cuanto a dicha participación del Sr. Carbonell, observamos que, al inicio del juicio surge como razón para solicitar la suspensión, transferencia y recalendarización de los procesos. El TPI puntualizó, según antes mencionado que, se había atendido previamente el asunto de transferencia de juicio y había sido planteado ante los foros apelativos, por lo que, ordenó que se marcara la evidencia para comenzar el desfile de prueba al día siguiente. A esos efectos, el TPI estableció que se comenzaría primero con el cobro de dinero y luego se pasaría la prueba sobre la reconvención.[35] Durante un turno de clarificación, la representante legal de Terrassa expresó que, para sus defensas afirmativas, sentaría a Marlyn Díaz en cuanto al cobro de dinero "pero lo más seguro para la reconvención no la estaría sentando porque ... yo no la traje para los fines de la Reconvención. Si llegara Carbonell, pues, lo sentaría para la Reconvención, no en cobro de dinero."[36]

De ahí se aprecia que, en esa etapa, la apelante no había anunciado ni solicitado que, se declarara al Sr. Carbonell como testigo no disponible ya que, parecería ser que, existía la posibilidad que "llegara Carbonell". Al otro día se pospuso el juicio para continuar por la tarde ante la situación de salud anunciada por la

---

[35] TPO 14 de febrero de 2023 págs. 33, 57,66.
[36] TPO 14 de febrero de 2023 pág. 70 líneas 7-20.

representante legal de Terrassa. Debido a la misma situación de salud de la abogada, la sesión en la tarde fue pospuesta para continuar al otro día.[37]

Durante el contrainterrogatorio del primer testigo observamos que, no surge el tema sobre testigo no disponible. Sin embargo, en una intervención, la representante legal de Terrassa informó, en relación con otro testigo (Jaime Rivera) que, "consultamos con el señor Carbonell por teléfono para ver si quería que lo llamara como testigo y tomaron la decisión ...que no, [...]." Lo antes, refleja que, el Sr. Carbonell estaba en comunicación directa y durante los procesos. Además, refleja su disponibilidad para participar en la toma de decisiones atinentes al litigio.

Conforme surge de la transcripción de la prueba, el TPI permitió a Terrassa presentar el testimonio de Luis Terrassa como parte de sus defensas del cobro de dinero y se le permitió declarar sobre las alegaciones de la reconvención.[38] Al concluir este testimonio, la representante legal de Terrassa informó que, "para esta parte ... teníamos la intención de presentar al Sr. Eduardo A. Carbonell García, el cual, ante su situación, es un testigo no disponible. Así que, hacemos una oferta de prueba del testimonio del Sr. Eduardo A. Carbonell García el cual no pudo eh, comparecer por justa causa." Sobre lo antes, objetó Cemex y en particular, indicó que, no se identificó en qué consistía el ofrecimiento de prueba. De hecho, es de notar que, en ese momento y distinto al inicio del juicio, se anunció el testimonio del Sr. Carbonell para las defensas del cobro de dinero y no exclusivamente en cuanto a la reconvención.

Por su parte, el TPI dejó sometido el asunto ante su consideración y ahí autorizó a Terrassa a presentar nuevamente al

---

[37] TPO, 14 de febrero de 2023 págs. 82 y 90.
[38] TPO, 16 de febrero de 2023 págs. 88-95.

testigo, Luis Terrassa, para probar las alegaciones de la reconvención.[39] Destacamos que, no surge de la transcripción de la prueba oral que la apelante haya informado sobre sus gestiones para lograr que el Sr. Carbonell declarase mediante videoconferencia. Por el contrario, la apelante informó que el Sr. Carbonell "no puede comparecer ni tan siquiera por videoconferencia"[40] sin detallar las razones para ello, más allá de informar la situación de su esposa. Lo antes, sin obviar que, según antes mencionado, pudimos constatar de la transcripción de la prueba que el Sr. Carbonell y su representante legal mantenían comunicación telefónica durante la celebración del juicio en su fondo.[41]

En su recurso, la apelante argumenta que, mediante el testimonio del Sr. Carbonell, podía establecer la causa de acción bajo la Ley Antimonopolística, *supra*. Sin embargo, no cumplió con los criterios que establece la Regla 806 de las Reglas de Evidencia, *supra*. Primeramente, surge de la transcripción de la prueba oral que durante el juicio se discutió que el Sr. Carbonell era testigo no disponible. Sin embargo, no se desprende de forma fehaciente que se haya procedido de conformidad con la Regla 806(b)(1) de las Reglas de Evidencia, *supra*. Destacamos que, como excepción a la exclusión de prueba de referencia, le correspondía a la apelante solicitar la admisibilidad de la deposición del Sr. Carbonell (ya que surge del expediente que fue depuesto entre el 2010 y el 2013) y así presentar la deposición. De no lograr su admisibilidad, correspondía -en el acto- hacer el ofrecimiento de prueba, haciendo constar su naturaleza, propósito y pertinencia.[42]

---

[39] TPO, 16 de febrero de 2023, págs. 175-181.
[40] TPO, 14 de febrero de 2023, pág. 19.
[41] TPO, 16 de febrero de 2023, pág. 47; TPO, 17 de febrero de 2023, págs. 149-150.
[42] TPO, 17 de febrero de 2023, pág. 67.

Es preciso señalar que, surge del Informe sobre Conferencia con Antelación al Juicio[43] y del informe enmendado[44] que, el Sr. Carbonell (al igual que el Sr. Terrassa) declararía sobre la condición suspensiva y las prácticas monopolísticas de Cemex. Ahora bien, ante la presunta imposibilidad del Sr. Carbonell de testificar durante el juicio, era necesario que la apelante cumpliera con la Regla 806 de las Reglas de Evidencia, *supra*. Secuela de lo anterior, Terrassa debió realizar una oferta de prueba en cuanto al alcance y contenido detallado de lo que hubiese declarado el Sr. Carbonell, tal cual lo exige la Regla 104(b) de las Reglas de Evidencia, *supra*. La representación legal de la apelante se circunscribió a "ofrecer" el testimonio del Sr. Eduardo A. Carbonell García[45] el cual "se recoge en el Informe de Conferencia con Antelación a Juicio."[46]

Ante la objeción de Cemex en cuanto a cuál sería el contenido de dicha oferta de prueba y de qué documento surge lo que testificaría, la representante legal de la apelante expresó que, el contenido de su testimonio sería "para probar la condición suspensiva con relación al cobro de dinero, con relación a la participación que este tuvo en las reuniones celebradas eh, con los representantes de Cemex. En adición [a] las eh, las gestiones afirmativas que este hizo eh, relacionadas a nuestra defensa afirmativa de la condición suspensiva en torno al cobro de dinero."[47]

Surge claramente en el dictamen recurrido la denegatoria del foro primario a dicha súplica y las oportunidades brindadas a Terrassa para permitir el testimonio del Sr. Carbonell por videoconferencia. De todos modos, ante la denegatoria del TPI a declarar al Sr. Carbonell como testigo no disponible, le correspondía a Terrassa, ante la presunta exclusión de prueba, realizar una oferta

---

[43] Apéndice, págs. 438-448.
[44] Apéndice, págs. 650-689.
[45] TPO, 16 de febrero de 2023, pág. 175.
[46] TPO, 16 de febrero de 2023, pág. 176.
[47] TPO, 16 de febrero de 2023, págs. 176-177.

de forma correcta y en cumplimiento con las reglas evidenciarias. En ausencia de lo antes, no se nos ha puesto en posición para evaluar cuál es la probabilidad de que, del Sr. Carbonell haber testificado durante el juicio, el dictamen del TPI hubiese sido distinto. A pesar de lo anterior, hemos evaluado la totalidad de la prueba, la transcripción y los autos originales en un esfuerzo por evaluar la razonabilidad y análisis del TPI.

Reconocemos que, la apelante intentó presentar en evidencia la Identificación #26 la cual resultó inadmisible por constituir prueba de referencia múltiple. Consistía en un facsímil que F&R Construction Group dirigió al Sr. Terrassa, el cual fue originalmente recibido por una tercera persona, de un cuarto remitente original. Ello, a los fines de establecer los precios de otro competidor sobre un proyecto.[48]

Cabe señalar que, tal como argumentó el representante legal de Cemex, el referido documento resulta inadmisible independientemente de que testificara durante el juicio el Sr. Carbonell o el Ing. Jaime Fullana Lefranc de F&R Construction Group. Conforme a la Regla 807 de Evidencia, *supra,* la prueba de referencia que a su vez contiene otra prueba de referencia no es admisible bajo la excepción que establece la Regla 806, *supra,* salvo que "cada parte de las declaraciones combinadas satisfa[ga] alguna excepción a dicha regla."[49]

De igual manera, resultó inadmisible la Identificación #50 de la apelante que contiene la minuta de una reunión ante la Asociación Puertorriqueña del Concreto (Asociación), en la cual participaron suplidores de la industria del cemento y sus derivados. Su inadmisibilidad responde a que, la referida minuta fue firmada por Thomas E. Kierce, quien fue excluido como testigo, según

---

[48] TPO, 17 de febrero de 2023, págs. 87-91.
[49] Regla 807 de las Reglas de Evidencia, *supra.*

abundaremos más adelante.[50] Sobre este tema, el Sr. Terrassa declaró durante el juicio que, los miembros de la Asociación acordaron expulsar a Cemex Concreto de dicha entidad y querellarse ante la OAM, pero nunca supo que dicha entidad hiciera algo al respecto.[51] Cabe recordar que, el TPI denegó el petitorio de la OAM para comparecer como amigo de la corte tras haber desestimado las causas de acción sobre asuntos monopolísticos, desestimación que posteriormente fue dejada sin efecto por un panel hermano de esta Curia. Tampoco surge cómo el Sr. Carbonell autenticaría dicho documento en aras de subsanar su inadmisibilidad.

De otra parte, la apelante hizo una oferta de prueba de dos hojas de trabajo sobre presuntas pérdidas económicas y de ventas que preparó el Sr. Carbonell (Identificaciones 51 y 52)[52] que, según Cemex, no eran documentos que correspondían al curso ordinario de los negocios. No obstante, la representante legal indicó que, en la deposición del Sr. Carbonell surge que, en efecto las hojas se prepararon como parte de las funciones del Sr. Carbonell como gerente general.[53] Sin embargo, como expusimos anteriormente, la apelante no presentó la deposición. Añádase que, sobre este tema, testificó el Sr. Terrassa, al abundar sobre los sucesos y pérdidas que llevaron la empresa a la quiebra.

Al aquilatar la totalidad de la prueba, resulta evidente que la juzgadora de los hechos correctamente concluyó que, la prueba sobre las pérdidas y la situación económica de Terrassa, no alcanzó el *quantum* de prueba necesario para establecer violaciones a la Ley Antimonopolística, *supra.* Tampoco se demostró la existencia de algún contrato, combinación o conspiración entre Cemex de Puerto

---

[50] TPO, 17 de febrero de 2023, págs. 102-106.
[51] TPO, 17 de febrero de 2023, 109-114.
[52] TPO, 17 de febrero de 2023, págs. 71-72.
[53] TPO, 17 de febrero de 2023 pág. 67.

Rico, Inc. y Cemex Concretos, Inc. que restrinja de forma irrazonable el comercio o los negocios en Puerto Rico, tal cual lo exige el Artículo 2 de la Ley Antimonopolística, *supra*. *G.G. & Supp. Corp. v. S. & F. Systs., Inc.*, 153 DPR 861 (2001). De otra parte, no surge del expediente que la apelante haya presentado u ofrecido prueba a los efectos de demostrar que llevó a cabo un análisis del mercado en términos geográficos, ni demostró cuáles son las participaciones de cada uno de los vendedores en dicho mercado. Lo antes, a modo de reflejar cuál fue el impacto que la presunta restricción que impuso Cemex en el precio ocasionó a los competidores que se dedican a la venta de cemento y hormigón en Puerto Rico. La apelante tampoco logró establecer a qué precio Cemex de Puerto Rico vendía el cemento a Cemex Concretos en comparación con otros competidores de Terrassa, a los efectos de sustentar su reclamación por discrimen en precios.

De otra parte debemos añadir que, surge de la transcripción de la prueba que, el Sr. Terrassa declaró sobre un listado de cotizaciones que entregó Cemex a la apelante (Exhibit 6 de la parte demandada).[54] Lo antes, con el fin de establecer los presuntos precios predatorios de Cemex y la documentación que Cemex le proveyó durante el descubrimiento de prueba.[55] Además, el Sr. Terrassa testificó sobre unas hojas de trabajo (Exhibit 8 de la parte demandada) que preparó el Sr. Carbonell, que discutieron ambos, las cuales relató forman parte del récord de negocio de la apelante.[56] Aclaró que, dichos documentos se utilizan para analizar los costos de cada operación.[57] Por último, para evidenciar los precios de la apelante en comparación con los de Cemex, el Sr. Terrassa declaró sobre las cotizaciones de Terrassa para los proyectos Sam's Walmart

---

[54] TPO, 17 de febrero de 2023, págs. 10-11.
[55] TPO, 17 de febrero de 2023, págs. 7-9 y 25.
[56] TPO, 17 de febrero de 2023, pág. 56.
[57] TPO, 17 de febrero de 2023, pág. 58.

de Barceloneta y Río Piedras South Public Transportation.[58] El Sr. Terrassa informó sobre las subastas en las cuales Cemex cotizó a unos precios muy por debajo del mercado, y en las que presuntamente Terrassa no resultó beneficiada. Sin embargo, no logró demostrar la relación de lo antes con la alegada conspiración y prácticas en contravención de las leyes antimonopolísticas.

En su recurso discute además que, el TPI eximió a Cemex de contestar de forma adecuada el descubrimiento de prueba y, con ello, violentó el debido proceso de ley de Terrassa al no permitirle descubrir lo necesario para sostener las alegaciones de la reconvención y para su perito estar en posición de preparar el informe pericial. Los remedios que solicita la apelante, relacionados al descubrimiento de prueba, fueron previamente atendidos por este panel (Recurso Núm. KLCE202200638). En aquella ocasión, determinamos no intervenir con el dictamen discrecional e interlocutorio del foro primario, mediante el cual, en el manejo del caso que pendía por más de una década, el foro *a quo* se negó a conceder más extensiones de tiempo a Terrassa para producir un informe pericial y denegó su solicitud de descubrir cierta prueba presuntamente incompleta de Cemex. Terrassa instó un recurso ante el Tribunal Supremo (Recurso Núm. CC-2022-0606) y el Alto Foro determinó no expedir el auto de *certiorari*. Al examinar dichos asuntos traídos ante nuestra atención, nuevamente constatamos del expediente que, el 29 de septiembre de 2020, Cemex produjo a la apelante unas cotizaciones en respuesta a los requerimientos de documentos números 1, 2 y 3[59] y, en esa etapa de los procesos, no surge que se haya levantado la insuficiencia de la documentación producida.[60] Fue con posterioridad que Terrassa indicó que necesitaba de Cemex información para demostrar sus alegaciones y

---

[58] TPO, 17 de febrero de 2023, págs. 121-129.
[59] Apéndice, pág. 641.
[60] Apéndice, págs. 574-575.

fue la base para solicitar prórrogas para presentar el informe pericial de forma tardía. De hecho, según antes discutido, la apelante obtuvo prueba en el descubrimiento sobre cotizaciones que fueron admitidas y aquilatadas por el juzgador de los hechos y no demostró que, lo que faltaba por descubrir, no fuera prueba acumulativa. Tampoco surge de una revisión del expediente que se haya demostrado de forma fehaciente que la parte apelada expolió la prueba solicitada por Terrassa desde el año 2012. Es de notar que, los ocho (8) testigos de Terrassa[61] que el foro primario excluyó fue debido a que estos no fueron anunciados en el Informe sobre Conferencia con Antelación al Juicio de 2013[62] ni durante el descubrimiento de prueba[63] sino más bien, y por primera vez, al cabo de nueve años en el Informe Preliminar entre Abogados y Abogadas Enmendado.[64] Además, de una revisión de la prueba presentada surge que, se admitieron varias cotizaciones para demostrar los precios. Sin embargo, no se logró demostrar que las demás pruebas no serían acumulativas de lo que fue admitido y discutido durante el proceso judicial o, en su defecto, cómo la referida prueba hubiera cambiado el resultado del caso. Lo antes, sin obviar que, el foro primario ofreció alternativas para que el Sr. Carbonell testificara durante el juicio mediante videoconferencia, opción que la apelante no acogió. Ello, a pesar de que surge de la transcripción de la prueba que la representante legal de Terrassa

---

[61] Los ocho (8) testigos eran: Thomas E. Kierce (Director Ejecutivo de la Asociación Puertorriqueña del Concreto); Carmen Betancourt (Gerente General de Master Concrete); Ricardo Del Rosario (Vicepresidente de Mercadeo de Master Concrete); Manuel Ríos (Presidente de Mr. Sun); Ing. Jaime Fullana Lefranc (representante de F&R Construction Group); René Di Cristina (Presidente de Ready Mix); Luis Rivera (representante de Quality Concrete Mix; y el Director o funcionario de la OAM. Apéndice, págs. 911-912.

[62] Apéndice, págs. 953-963.

[63] Véase, *Resolución* del TPI emitida el 25 de octubre de 2022. Apéndice, págs. 990-991. Lo anterior fue objeto de revisión judicial por un panel hermano de esta Curia (Recursos consolidados Núm. KLCE202300042 y KLCE202300118) y por el Tribunal Supremo (Recurso Núm. CC-2023-0095) sosteniendo así la exclusión. Por tanto, el referido dictamen constituye ley del caso.

[64] Véase, *Resolución* del TPI emitida el 25 de octubre de 2022. Apéndice, págs. 990-991. Lo anterior fue objeto de revisión judicial por un panel hermano de esta Curia (Recursos consolidados Núm. KLCE202300042 y KLCE202300118) y por el Tribunal Supremo (Recurso Núm. CC-2023-0095) sosteniendo así la exclusión. Por tanto, el referido dictamen constituye ley del caso.

mantenía comunicación telefónica con el Sr. Carbonell durante el juicio.[65]

De lo antes colegimos que, la apelante no demostró cumplimiento con los criterios que establece la Regla 48 de Procedimiento Civil, *supra*, y con la casuística aplicable, a modo de justificar la celebración de un nuevo juicio. No evidenció de qué manera dicha prueba era esencial y cómo hubiese cambiado el resultado del pleito. *First Bank of P.R. v. Inmob. Nac., Inc.*, supra; *Riley v. Rodríguez de Pacheco,* supra. Además, luego de analizar cuidadosamente el presente recurso, el voluminoso expediente que lo acompaña, junto a la transcripción de la prueba oral y a los autos originales, colegimos que, no se reúnen los criterios para intervenir con la apreciación de la prueba y con la adjudicación de las controversias que realizó el foro primario atinentes a la reconvención. Sobre tales bases, concluimos que los errores 2, 3, 5 al 9 no se cometieron.

Por último y en el cuarto señalamiento de error, la apelante aduce que el foro primario erró al declarar con lugar la acción de cobro de dinero. Sin embargo, de nuestra evaluación del recurso ante nos, concluimos que el foro primario actuó correctamente en su análisis. Surge de la prueba admitida y creída por el juzgador de los hechos que, la apelante aceptó haber recibido la mercancía objeto de esta causa de acción y admitió haberla retenido sin pagar por ella. Asimismo, constituye un hecho probado que, la apelante reconoció dentro de la Petición de Quiebra bajo el Capítulo 11 del Código de Quiebras (Case no. 16-00182ESL11) que tiene una deuda pendiente con Cemex. Puntualizamos que, ante el foro federal, Terrassa no clasificó la deuda admitida y estipulada como

---

[65] TPO, 16 de febrero de 2023, pág. 47; TPO, 17 de febrero de 2023, págs. 149-150.

contingente o sin liquidar o en disputa, ni sujeta a una compensación.[66]

Cónsono con lo anterior, y conforme a la normativa antes expuesta, en ausencia de una condición suspensiva válida, estamos ante una deuda vencida, líquida y exigible. *RMCA v. Mayol Bianchi*, supra. A lo antes añadimos que, tal cual resolvió el Tribunal Supremo de Estados Unidos de América, en *Kelly v. Kosuga*, 79 S. Ct. 429, a las págs. 518-519, no se puede invocar como defensa a un cobro de dinero una alegación por violación a la Ley Antimonopolística[67] la cual claramente tampoco probó, según discutimos previamente. El cuarto error no se cometió.

Tras un estudio sosegado del recurso, del apéndice, de la transcripción de la prueba oral y de los autos originales concluimos que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto se sostiene el dictamen recurrido. Los errores señalados no se cometieron.

---

[66] Apéndice, pág. 653.

[67] As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court. This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold. In Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679, one who had purchased merchandise from a firm allegedly a combination in restraint of trade was not allowed to set up that fact as a defense to an action for the purchase price. In D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, Corn Products sold merchandise to Wilder with a standing offer, of which the latter apparently had sought to take some advantage, to give Wilder a rebate if it bought exclusively from it. Again, in an action by the seller, Corn Products, to recover the agreed price, the purchaser, Wilder, was denied any defense of illegality based on the Sherman Act. The Court observed that the Sherman Act's express remedies could not be added to judicially by including the avoidance of private contracts as a sanction. Id., 236 U.S. at pages 174—175, 35 S.Ct. at pages 401—402. Cf. Bruce's Juices, Inc., v. American Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219. See A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, 252, 45 S.Ct. 300, 302, 69 L.Ed. 597, generally to the same effect. Obviously, state law governs in general the rights and duties of sellers and purchasers of goods, and, while the effect of illegality under a federal statute is a matter of federal law, Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176—177, 63 S.Ct. 172, 173—174, 87 L.Ed. 165, even in diversity actions in the federal courts after Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, still the federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act. (Nota omitida.) Posteriormente, en *Kaiser Steel Corp v. Mullins,* 455 US 72, 79-80 (1982), el máximo foro federal ratificó lo resuelto en *Kelly v. Kosuga*, supra, y lo distinguió de los casos en los cuales el acuerdo que se pretende hacer cumplir viola alguna ley federal. A esos efectos concluyó "[...] a federal court has a duty to determine whether a contract violates federal law before enforcing it." *Íd.*, pág. 83.

**IV.**

Por los fundamentos antes esbozados, confirmamos el dictamen apelado.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones